UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHAEL JERMAINE JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-03313-SEB-TAB |
| | ) | |
| COFFEE, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

Plaintiff Michael Johnson, an inmate at Pendleton Correctional Facility, brings this lawsuit alleging defendants Captain Coffee and Lieutenant Girdler were deliberately indifferent to the conditions of his confinement while he was at Plainfield Correctional Facility in violation of the Eighth Amendment. Specifically, he alleges that the defendants knew he was in a small, poorly ventilated cell infested with black mold for several months and did not make reasonable efforts to abate the substantial risk to his health. As a result, he was injured.

The defendants have moved for summary judgment and dismissal of the action. The plaintiff failed to file a response in opposition, but the evidence in the record reflects summary judgment is not appropriate in this case. The record reflects that Mr. Johnson was exposed to black mold for several months, that the defendants knew about this exposure, and that the defendants failed to take reasonable steps within their discretion to remove the black mold from his cell. Construing the evidence in the light most favorable to Mr. Johnson, the Court concludes that a reasonable jury could find that the defendants were deliberately indifferent to the conditions of Mr. Johnson's confinement, that this deliberate indifference caused Mr. Johnson to suffer an objectively serious harm, and that the defendants are not entitled to qualified immunity. Accordingly, the motion for summary judgment is **DENIED**.

# I.
## SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that the movant is entitled to judgment as a matter of law because there is no genuine dispute as to any material fact. *See* Fed. R. Civ. P. 56(a). A party must support any asserted disputed or undisputed fact by citing to specific portions of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party may also support a fact by showing that the materials cited by an adverse party do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the only disputed facts that matter are material ones—those that might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609−10 (7th Cir. 2018). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant to the summary

judgment motion. *Grant v. Trust. Of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (quotation marks omitted); *see also* Fed. R. Civ. P. 56(c)(3).

## II.
## BACKGROUND

Mr. Johnson was sentenced to a term of imprisonment at the Indiana Department of Correction ("IDOC") in August 2015.[1] He has spent time in multiple IDOC facilities since that time. Dkt. 43-1, p. 7, 37; dkt 43-2, para. 6. The allegations described in the complaint occurred while he was at Plainfield Correctional Facility between May 23, 2019, and August 30, 2019. Dkt. 1; dkt. 43-1, p. 7.

Prior to the allegations described in the complaint, from August 2017 to January 2018, Mr. Johnson worked on a dorm detail crew at Putnamville Correctional Facility. Dkt. 43-1, p. 37. As part of this employment, Mr. Johnson was trained by IDOC officials to identify the presence of black mold. *Id.* at 38 He was also trained to remove black mold and was aware of both the administrative procedures and hands-on work involved in black mold removal. *Id.* at 38-41. First, Mr. Johnson or another member of the crew would identify the black mold by sight. *Id.* at 38. Then, prison officials would provide the crew with germicide, a white chemical substance, and scratch pads to scrub the affected area. *Id.* If that process was unsuccessful, a safety hazard supervisor would inspect the area and determine that the area should be power washed with bleach. *Id.* at 39. Other times, the decision to power wash the area would be left to "staff, sergeants, lieutenants, or captains." *Id.* At that point, the crew would be provided with bleach and a power washer to remove the black mold. *Id.* at 39-40. After the black mold was removed, the crew would be given paint to cover up the previously affected area. *Id.* at 38.

---

[1] *See* https://www.in.gov/apps/indcorrection/ofs/ofs?offnum=985776&search2.x=58&search2.y=15.

On May 23, 2019, Mr. Johnson was involved in a physical assault with another inmate. *Id.* at 19-20. As a sanction, he was placed in disciplinary segregation for 110 days. *Id.* at 20, 31. During that time, he spent 23 hours a day in a cell by himself. *Id.* at 31. The cell had a toilet and a bed. *Id.* at 28. A few inches from the bed, there was an exterior window, which was made of metal. *Id.* at 28-29, 44. An electronic control for the window was broken, but a small metal grate on the window could be manually opened from the outside by prison staff. *Id.* Prison staff would occasionally open the metal grate at Mr. Johnson's request, but at all other times the grate remained closed. *Id.* at 29. There was no other ventilation in Mr. Johnson's cell; the cell had a solid metal door with a cuff port that was only opened to remove Mr. Johnson from the cell or to provide him with a meal tray. *Id.* at 30.

On the first day Mr. Johnson was placed in his cell, he discovered patches of black mold lining the caulk around the window. *Id.* at 36. The black mold produced a noxious odor that Mr. Johnson described as a "stinging, kind of burn your nostrils smell." *Id.* at 34-35. Within four or five days, Mr. Johnson became sick. *Id.* at 34. His symptoms started as "agonizing tension headaches, and then they began building into throbbing migraines." *Id.* Mr. Johnson also experienced shortness of breath, sinus infections, and wheezing. *Id.* at 35. The medical staff provided Mr. Johnson with an inhaler, Excedrin, and allergy pills to treat these symptoms. *Id.* Mr. Johnson had never experienced a migraine before he was confined to Plainfield Correctional Facility. *Id.* at 52.

The severity of Mr. Johnson's symptoms began to improve after his time in disciplinary segregation ended. *Id.* at 58-59. He still experiences wheezing and shortness of breath and occasionally uses an inhaler, but he no longer experiences migraines, and his symptoms are "nowhere on the scale that they used to be." *Id.* at 58, 59.

Mr. Johnson notified Captain Coffee and Lieutenant Girdler about the black mold in his cell and asked to be moved to a different cell. *Id.* at 41-42. Captain Coffee and Lieutenant Girdler denied this request because there were no available cells in the restrictive housing unit at that time. *Id.* at 41-42. In May 2019, Captain Coffee and Lieutenant Girdler provided Mr. Johnson with germicide, a white chemical substance, and scratch pads so he could attempt to remove the black mold from the window. *Id.* at 42. Mr. Johnson cleaned the affected area in accordance with his training as a dorm detail employee. *Id.* Mr. Johnson testified, "[I]t was pertaining to my health, so, of course, I tried to clean it to the best of my ability." *Id.* Despite Mr. Johnson's efforts, the germicide, white chemical substance, and scratch pads were ineffective at removing the patches of black mold. *Id.* at 44. Staff members inspected the area, and Captain Coffee and Lieutenant Girdler were notified that there were still patches of black mold in Mr. Johnson's cell. *Id.*

Captain Coffee and Lieutenant Girdler did not take the next step of ordering the removal of the black mold with a power washer and bleach, nor did they arrange for a safety hazard supervisor to inspect the black mold in Mr. Johnson's cell. *Id.* at 48-49. Mr. Johnson continued to be exposed to black mold in a poorly ventilated cell for 23 hours a day, and his physical health continued to deteriorate. *Id.*

After Mr. Johnson submitted grievances related to black mold in his cell, in June 2019, Captain Coffee and Lieutenant Girdler again provided Mr. Johnson with germicide, a white chemical substance, and scratch pads. *Id.* at 46. These were the same materials that were previously ineffective at removing the black mold from Mr. Johnson's cell. *Id.* at 46-47. Mr. Johnson again tried to remove the black mold to the best of his ability, but this round of cleaning was also ineffective. *Id.* at 47.

Sometime thereafter, Sergeant Ballard provided Mr. Johnson with paint and a paintbrush to cover the black mold in his cell. *Id.* at 51. Mr. Johnson painted over the black mold, but his health problems persisted. *Id.* at 51, 58-59.

On July 9, 2019, Chet Remley, the safety hazard supervisor at Plainfield Correctional Facility, inspected Mr. Johnson's cell. *Id.* at 56. Mr. Remley told Mr. Johnson that he was unaware of Mr. Johnson's earlier complaints about black mold in his cell. *Id.* Following the inspection, Mr. Remley recommended that the caulking around the window be removed and replaced. *Id.* at 56-57.

Following Mr. Remley's inspection, Mr. Johnson remained in the cell for the duration of his disciplinary sanction. *Id.* at 58. Mr. Johnson continued to complain to staff, Captain Coffee, and Lieutenant Girdler about the black mold in his cell. *Id.* at 67-69. His requests that the black mold be removed or that he be moved to a different cell were denied. *Id.*

## III.
## DISCUSSION

### A. Mr. Johnson's Eighth Amendment Claims

To prevail on his Eighth Amendment claims, Mr. Johnson must show that the defendants imposed conditions which denied him "the minimal civilized measure of life's necessities." *Gillis v. Litscher*, 468 F.3d 488, 491 (7th Cir. 2006) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981)). He must also show that the defendants acted with a culpable state of mind:

> [A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.

*Farmer v. Brennan,* 511 U.S. 825, 847 (1994).

A reasonable jury could conclude that the evidence in the record satisfies the objective prong of Mr. Johnson's Eighth Amendment claims against Captain Coffee and Lieutenant Girdler. Mr. Johnson was exposed to black mold in a poorly ventilated cell 23 hours a day for 110 consecutive days. Dkt. 43-1, pp. 20, 28-31, 36, 44. As a result of this mold exposure, he suffered agonizing tension headaches and migraines, sinus infections, shortness of breath, and wheezing. Dkt. 43-1, pp. 34-35. These symptoms were sufficiently serious for the medical staff to provide him with an inhaler, Excedrin, and allergy medications. *Id.* at 35. Although the severity of these symptoms improved after Mr. Johnson was removed from disciplinary segregation, he continues to suffer long-term damage to his respiratory system and still uses an inhaler to treat these respiratory symptoms. *Id.* at 58-59.

In *Board v. Farnham*, 394 F.3d 469 (7th Cir. 2005), the Seventh Circuit recognized that poor ventilation and black mold exposure may violate an inmate's Eighth Amendment right to humane conditions of confinement. The plaintiffs in *Brown* satisfied the objective prong of their claims by demonstrating that the poor ventilation and airborne contaminants, such as black mold and fiberglass dust, caused them to suffer nosebleeds, respiratory distress, and possible long-term consequences such as worsening asthma. *Id.* at 486. Mr. Johnson's symptoms were at least as serious as those suffered by the plaintiffs in *Brown*. Like those plaintiffs, Mr. Johnson has suffered long-term damage to his respiratory system. In accordance with this controlling precedent, the Court concludes that Mr. Johnson was exposed to an objectively serious harm when he was confined to a small, poorly ventilated cell containing patches of black mold for 110 consecutive days.

The defendants concede "it is clear that Mr. Johnson was exposed to mold within his cell during several months in 2019 at Plainfield [Correctional Facility]." Dkt. 44, p. 16. They do not

contest that this exposure was objectively serious, nor do they contest that Mr. Johnson's medical conditions were caused by this exposure. *See generally id.* at 16-17. Instead, the defendants argue that they were not subjectively aware that the black mold in Mr. Johnson's cell posed a substantial risk to his health and that they made reasonable efforts to abate that risk.

After due consideration of the evidence in the light most favorable to Mr. Johnson, the Court concludes that a reasonable jury could find that Captain Coffee and Lieutenant Girdler were subjectively aware of a substantial risk of harm to Mr. Johnson's health and failed to take reasonable actions to address that harm. The defendants held supervisory positions in the restrictive housing unit at Plainfield Correctional Facility. They knew that Mr. Johnson was in a small, poorly ventilated cell for 23 hours a day. They also knew that there was black mold growing in Mr. Johnson's cell and that he had repeatedly complained about this condition. Under these circumstances, the evidence could support a reasonable conclusion that the defendants were aware that the conditions Mr. Johnson was forced to endure—constant, prolonged exposure to black mold in a small, poorly ventilated cell—posed a substantial risk to his health.

The defendants' argument that they may not have known that black mold exposure carries health risks is unpersuasive. It is generally known that mold exposure is harmful to humans. A moldy basement is bad enough, but it is hard to imagine that anyone could learn about a mold infestation inches away from their nightstand and not be concerned about a substantial risk to their health. Furthermore, the defendants were supervisors of a restrictive housing unit tasked with overseeing black mold removal, and a jury could reasonably find that they were aware that constant mold exposure for 110 days posed a substantial risk to Mr. Johnson's health.

The defendants' argument that they may not have been aware of the amount of black mold growing in Mr. Johnson's cell because they may have chosen not to investigate the matter is also

8

unpersuasive. This argument comes dangerously close to conceding "willful blindness," which the Supreme Court has held is a state of mind more culpable than "deliberate indifference." *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769-770 (2011) ("willful blindness" occurs where a defendant subjectively believes there is a high probably that a fact exists and takes deliberate actions to avoid knowing that fact). The defendants knew that patches of black mold were growing in Mr. Johnson's cell, and they were personally involved in decisions about how to remove it. The possibility that they may have shielded themselves from learning the extent of the mold infestation in Mr. Johnson's cell is no defense.

The defendants also argue that they took reasonable steps to abate the risk of mold exposure to Mr. Johnson's health, but this argument ignores evidence of effective reasonable alternatives the defendants could have pursued when their initial efforts failed. In his deposition, Mr. Johnson outlined the hands-on steps and administrative procedures for black mold removal at IDOC facilities. The first step is to scrub the affected area with scratch pads, germicide, and a white chemical substance. Dkt. 43-1, p. 38. If that step is ineffective, the second step is to power wash the affected area with bleach. *Id.* Power washing may be ordered at the discretion of a captain, a lieutenant, or the facility's safety hazard supervisor. *Id.* at 39. After the mold is removed by the power washer and bleach, the previously affected area is painted over. *Id.* at 38.

Captain Coffee and Lieutenant Girdler initiated the first step in the black mold removal process. However, when that step proved ineffective, they failed to initiate additional corrective measures that were within their discretion as supervisors of the restrictive housing unit. They did not approve an order to power wash the area with bleach, nor did they bring this issue to the attention of the safety hazard supervisor. Instead, they had Mr. Johnson repeat the process of scrubbing the area with low-strength cleaning supplies—a process that they already knew was

ineffective at removing the black mold in his cell. After that, they took no additional actions and left Mr. Johnson to inhale black mold for the next several months.

The fact that Captain Coffee and Lieutenant Girdler took *some* action to address the black mold in Mr. Johnson's cell is not dispositive. "[A] prisoner need not show that he was completely ignored to demonstrate deliberate indifference." *Myrick v. Anglin*, 496 F. App'x 670, 674 (7th Cir. 2012) (holding that prison medical staff are deliberately indifferent when they persist with treatment they know to be ineffective when reasonable alternatives are available); *Brown*, 394 F.3d at 486 (holding that the defendants could not avoid liability for black mold exposure by ordering the "flimsy, non-productive band-aid procedure of merely vacuuming the grates" when they knew that procedure would be ineffective).

Captain Coffee and Lieutenant Girdler had the authority to take reasonable measures to abate the risk of harm to Mr. Johnson's health. Instead, they chose to follow a path that they knew was ineffective. There is no evidence that power washing the black mold would have been unreasonable, that removing and replacing the caulk around the window as Mr. Remley recommended was infeasible, or that such decisions were beyond their authority as supervisors in the restrictive housing unit at Plainfield Correctional Facility. Accordingly, the Court concludes that a reasonable jury could find that Captain Coffee and Lieutenant Girdler violated Mr. Johnson's Eighth Amendment rights by failing to take reasonable steps to abate the substantial risk to his health from the black mold in his cell.

### B.  Qualified Immunity

Qualified immunity protects government officials from damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" at the time that the conduct occurred. *Campbell v. Kallas*, 936 F.3d

536, 545 (7th Cir. 2017) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). In considering a qualified immunity defense, courts evaluate "(1) whether the facts, taken in the light most favorable to the plaintiff[ ], show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009).

To be "clearly established," a constitutional right "must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). The principle of fair notice pervades the qualified immunity doctrine. *Campbell*, 936 F.3d at 545. Qualified immunity applies unless the specific contours of the right "were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014).

Given this emphasis on notice, clearly established law cannot be framed at a "high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Wesby*, 138 S. Ct. at 590 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, (1987)). Existing caselaw must "dictate the resolution of the parties' dispute," *Comsys, Inc. v. Pacetti*, 893 F.3d 468, 472 (7th Cir. 2018). While "a case directly on point" is not required, "precedent must have placed the . . . constitutional question beyond debate," *White v. Pauly*, 137 S. Ct. 548, 551, (2017) (quotation marks omitted). Put slightly differently, a right is clearly established only if "every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015).

"The Supreme Court's message is unmistakable: Frame the constitutional right in terms granular enough to provide fair notice because qualified immunity 'protects all but the plainly

11

incompetent or those who knowingly violate the law.'" *Campbell*, 936 F.3d at 546 (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quotation marks omitted).

In *Brown*, the Seventh Circuit held the defendants were not entitled to qualified immunity because "there can be no question that the right to adequate and healthy ventilation was, and has been for some time, a clearly established constitutional right at the time of the [plaintiffs'] incarceration." 394 F.3d at 487 (citing *Shelby County Jail Inmates v. Westlake*, 798 F.3d 1085, 1087 (7th Cir. 1986); *Benjamin v. Fraser,* 343 F.3d 35, 52 (2d Cir. 2003); *Chandler v. Baird,* 926 F.2d 1057, 1065 (11th Cir. 1991); *Carver v. Knox County,* 887 F.2d 1287, 1293 (6th Cir.1989); *Helling v. McKinney,* 509 U.S. 25, 34-36 (1993).

In addition to recognizing a general right to adequate ventilation, *Brown* specifically held that the plaintiffs' exposure to black mold for a period of 126 days was an objectively serious harm and that the defendants could not avoid liability by ordering the "flimsy, non-productive band-aid procedure of merely vacuuming the grates" when they knew that procedure would be ineffective. 394 F.3d at 486. It was therefore clearly established that prolonged black mold exposure poses a substantial risk to an inmate's health and that prison officials may not limit their corrective action to procedures that they know are ineffective when reasonable alternatives are available.

As in *Brown*, there is evidence that Mr. Johnson was constantly exposed to black mold for several months, that the defendants were aware of this black mold exposure, and that they engaged in procedures that they knew were ineffective despite having the authority to order effective and reasonable alternatives. Given the existing precedent at the time of the defendants' conduct and the evidence in the record, there is evidence from which a reasonable jury could conclude that the defendants violated existing clearly established federal law and are not entitled to qualified immunity. Accordingly, the motion for summary judgment is **DENIED**.

# IV.
## CONCLUSION AND FURTHER PROCEEDINGS

The defendants' motion for summary judgment, dkt. [43], is **DENIED**. The Court will issue a scheduling order to direct the resolution of this action in due course.

The Court previously denied Mr. Johnson's motions for assistance recruiting counsel. *See* dkts. 5, 13. Given the complexities of late-stage litigation, such as a jury trial or settlement conference, the Court *sua sponte* **RECONSIDERS AND GRANTS** Mr. Johnson's motions for assistance recruiting counsel and will attempt to recruit counsel on his behalf.

**IT IS SO ORDERED**.

Date: _____5/5/2021_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

MICHAEL JERMAINE JOHNSON
985776
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Inmate Mail/Parcels
4490 West Reformatory Road
PENDLETON, IN 46064

Archer Riddick Randall Rose
INDIANA ATTORNEY GENERAL
archer.rose@atg.in.gov

13